UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES KEITH MOODY,

                                   CASE NO. 2:20-cv-13122

        *Plaintiff*,             DISTRICT JUDGE GERSHWIN A. DRAIN

*v.*                             MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

       *Defendant.*

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 15)**

## I.    RECOMMENDATION

Considering the entire record in this case, I suggest that substantial evidence supports the Commissioner of Social Security's determination that Plaintiff, Charles Moody, is not disabled. Accordingly, I recommend that the Court **DENY** Plaintiff's motion for summary judgment, (ECF No. 13), **GRANT** the Commissioner's motion, (ECF No. 15), and affirm the decision.

## II.    REPORT

### A.    Introduction and Procedural History

Plaintiff filed an application for supplemental security income ("SSI") on November 20, 2018, and completed this application, along with an application for Disability Insurance Benefits ("DIB") on January 3, 2019. (ECF No. 9, PageID.41, 293, 300, 302, 327–329.) In these applications, Plaintiff alleged that his disability began on January 1, 2013. (*Id.* at PageID.293, 300, 302.) The SSA denied his DIB claim at the initial level on January 8,

1

2019, and his SSI claim on April 3, 2019.  (*Id.* at PageID.175, 180.)  Apparently only appealing the Commissioner's decision on his SSI application, Plaintiff requested a hearing before an ALJ which was held on January 24, 2020.  (*Id.* at PageID.62, 189–90.)  On the same day as his hearing, Plaintiff amended his initial onset date to November 20, 2018. (*Id.* at PageID.325.)  The ALJ issued a decision on February 5, 2020, finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (*Id.* at PageID.38, 56.) The Appeals Council denied review on September 25, 2020. (*Id.* at PageID.27.)

Plaintiff subsequently filed a complaint seeking judicial review of the ALJ's final decision on November 25, 2020.  (ECF No. 1.)  This case was referred to the undersigned the same day.  (ECF No. 3.)  Both parties filed cross-motions for summary judgment.  (ECF Nos. 13, 15.)

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider

any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.   Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2012). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets

3

or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2016); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2016).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2016)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 9, PageID.56.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 20, 2018. (*Id.* at PageID.44.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, perirectal abscess, schizophrenia, antisocial personality disorder, intellectual disorder, depression, and anxiety. (*Id.*) The ALJ found that Plaintiff's diabetes mellitus with retinopathy, nuclear sclerosis, and lattice degeneration was a medically determinable impairment, but not severe. (*Id.* at PageID.44–45.) At step three, the ALJ decided that none of Plaintiff's severe impairments met or medically equaled a listed impairment. (*Id.* at PageID.45.) Next, the ALJ determined that Plaintiff had a residual functioning capacity to perform light work,[1] except that Plaintiff required "an at-will sit/stand option," could not "perform production rate or pace work, and could only "perform simple, routine tasks with no interaction with the public and occasional interaction with co-workers." (ECF No. 9, PageID.49.) At step four, the ALJ found that Plaintiff had no past relevant work. (*Id.* at PageID.54.) At step five, the ALJ found that jobs which Plaintiff could perform existed in significant numbers in the national economy. (*Id.* at PageID.54–55.)

### E.  Background

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (2021).

### 1.  Medical Evidence

Plaintiff suffers from several impairments which he claims prevent him from working.  Specifically, Plaintiff claims that he suffers from degenerative disc disease, a perirectal abscess, schizophrenia, antisocial personality disorder, intellectual disorder, depression, anxiety, diabetes, neuropathy, and obesity.  (*Id.* at PageID.44; ECF No. 13, PageID.648.)  On appeal, Plaintiff only challenges the ALJ's findings regarding his diabetes, neuropathy, and obesity.  Specifically, Plaintiff agues that the ALJ failed to account for these impairments in his decision.

  Each impairment is documented throughout Plaintiff's medical record.  Indeed, several treatment notes recognize that Plaintiff is a diabetic.  (ECF No. 9, PageID.419, 421, 475, 477, 530, 536, 538, 540, 543, 562, 573, 606.)  Likewise, a physician once noted that Plaintiff was "morbidly obese" and experiencing "obvious discomfort"; however, Plaintiff regularly had a body mass index that was slightly below thirty—the size at which most physicians consider a patient to be obese.  (*Id.* at PageID.436, 542, 580, 593, 608–09, 616, 621.)

From Plaintiff's alleged onset date, his treatment notes indicate that he suffered from neuropathy and treated his condition with Neurontin.  (*Id.* at PageID.359, 423, 540, 567, 590, 594, 606.)  Indeed, Plaintiff once complained to his physician that he had difficulty balancing due to "numbness and tingling" caused by his neuropathy.  (*Id.* at PageID.423.)  Physicians confirmed Plaintiff's diagnosis on April 25, 2019 by conducting a monofilament foot examination.  (*Id.* at PageID.594.)  During this exam, Plaintiff's physician brushed a nylon fiber over Plaintiff's feet and tested whether Plaintiff could feel

the fiber.  *See* Jacquelien Dros et al., *Accuracy of Monofilament Testing to Diagnose Peripheral Neuropathy: A Systematic Review*, Ann. Fam. Med., Nov. 1, 2009.  After finding that Plaintiff could not adequately detect the fiber, physicians recommended that he continue to take Neurontin.  (ECF No. 9, PageID.594.)

### 2.  Plaintiff's Testimony at the Administrative hearing

The ALJ began the hearing by examining Plaintiff.  (*Id.* at PageID.70.)  Very little of Plaintiff's testimony concerns the narrow issues he raises before this Court; in fact, his attorney implied to the ALJ that Plaintiff did not suffer from either neuropathy or obesity.  (*Id.* at PageID.69.)  Still, Plaintiff testified that he weighed 212 pounds and stood at six feet and three inches tall.  (*Id.* at PageID.70.)  Plaintiff also told the ALJ that he took medication commonly used to treat neuropathy.  (*Id.* at PageID.78.)

Plaintiff then described his typical day.  (*Id.* at PageID.80.)  He explained that most days he would wake himself up at six in the morning and make breakfast.  (*Id.*)  He testified that he had no problem handling his own hygiene and he would keep himself busy during the day by performing chores for himself and his neighbors.  (*Id.*)  For example, he would walk his dog, rake yards, and shovel snow.  He further testified that he could drive and regularly communicated with his family.  (*Id.* at PageID.80–81.)

### 3.  The VE's Testimony at the Administrative Hearing

After Plaintiff testified, the ALJ questioned the vocational expert ("VE").  (*Id.* at PageID.86.)  The ALJ assumed that Plaintiff had no past relevant work.  (*Id.* at PageID.87.)  The ALJ then asked the VE whether there were any jobs in the national economy that a hypothetical person of the same age and educational level as Plaintiff could perform,

provided that the hypothetical person could perform a limited range of light work. Specifically, this individual would "require an at will sit/stand option," could not "perform production rate or pace work," could "only perform simple" and "routine tasks," could not interact with the public, and could only occasionally interact with his or her coworkers. (*Id.* at PageID.87–88.)

The VE replied that the hypothetical person could work as a garment sorter, Dictionary of Occupational Titles ("DOT") code 222.687-0014, light work, approximately 55,000 jobs; a mail clerk, DOT code 209.687-026, light work, approximately 51,000 jobs; and a folder, DOT code 369.687-018, light work, approximately 53,000 jobs. (*Id.* at PageID.88–89.)

The ALJ then asked whether any jobs were available in the national economy for an individual with the same limitations as the last hypothetical, except that this person would "be off task [twenty] percent per day on a regular, ongoing basis." (*Id.* at PageID.89.)  The VE replied that such an individual could not find work in the national economy, explaining that any person who would be off task for more than a tenth of the day could not find work.  (*Id.* at PageID.89–90.)

Next, the ALJ asked whether the individual from the first hypothetical could work in the national economy if they would require "verbal work instructions." (*Id.* at PageID.90.)  The VE testified that this individual could perform the same jobs as the individual from the first hypothetical.  (*Id.*)

**F.  Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2012). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration ("SSA") "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the

10

persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* § 404.1520c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)     Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation

requirements."  The ALJ will consider "source-level articulation."  Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.*  The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2).  As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.  We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we

articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

14

     (iii)    Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

     (iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

     (v)    Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

     (vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood,

thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as

consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a).  The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . .  We will

consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)   [D]aily activities;

(ii)  The location, duration, frequency, and intensity of . . . pain;

(iii) Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)  Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)   The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

## G.    Arguments and Analysis

Plaintiff argues that the ALJ erred by not considering the effects of his neuropathy, obesity, and diabetes on his RFC. Specifically, Plaintiff argues that the ALJ neglected to discuss his obesity and neuropathy at step two, which led the ALJ to ignore any functional limitations these impairments may have caused. And, while Plaintiff admits that the ALJ acknowledged his diabetes at steps four and five, he faults the ALJ for not explicitly discussing its effect on his RFC.[2]

Plaintiff does not argue that the ALJ's RFC finding was not supported by substantial evidence. Rather, he implies that had the ALJ considered all his impairments, then he "could" have found a more restrictive RFC. (ECF No. 13, PageID.653.) In other words,

---

[2] Plaintiff devotes most of his brief to arguing that the ALJ should have not only have found that his obesity, diabetes, and neuropathy were medically determinable impairments, but that they were severe impairments. (ECF No. 13, PageID.648–49.) But this issue is "legally irrelevant"—once an ALJ finds one severe impairment, he must consider all medically determinable impairments, whether severe or nonsevere, throughout the rest of the analysis. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) (quotation marks omitted) (quoting *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). Because the ALJ here found multiple severe impairments, any error in failing to find that Plaintiff's obesity, diabetes, or neuropathy were severe impairments would have been harmless. *See id.* Accordingly, the Court should limit its analysis to whether the ALJ properly considered the effects of these impairments on Plaintiff's RFC.

Plaintiff argues that the ALJ made a legal error—even if supported by substantial evidence, the ALJ failed to consider the entire record in his decision. *See* 42 U.S.C. § 423(d)(5)(B) (2012) (requiring ALJ's to "consider all evidence available in [the claimant's] case record"). And, had the ALJ considered the entire record, he may have chosen to adopt a more restrictive RFC.

### 1.     Plaintiff's Obesity and Neuropathy

At step two, an ALJ must consider whether the claimant has any severe, medically determinable impairments. 20 C.F.R. § 416.920(a)(4)(iii) (2021). If the claimant has at least one severe medically determinable impairment, the ALJ proceeds through the sequential evaluation process, considering all the claimant's medically determinable impairments—both severe and nonsevere. *Id.* §§ 404.1545(a)(2), 416.920(c). The ALJ need not, however, consider any impairments that are not medically determinable. *See id.* § 404.1545(a)(2).

The crux of Plaintiff's argument is not that the ALJ incorrectly found that his neuropathy and obesity were not medically determinable impairments, it is that the ALJ completely declined to consider whether these impairments were medically determinable. (*See* ECF No. 13, PageID.649–51.) However, although the ALJ did not mention either impairment in his decision, I suggest that he considered both impairments at step two.

Under 42 U.S.C. § 423(d)(5)(B), an ALJ must consider a claimant's entire medical record before rendering a decision. *See also* 20 C.F.R. § 404.1520(a)(3) (2021); Carolyn A, Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal

Court § 6:20 (2019) ("It should be fairly obvious that the ALJ must evaluate all of the evidence, and may not disregard any of the relevant evidence.").  This does not mean, however, that an ALJ must discuss every piece of evidence in the record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (quoting *Loral Defense Systems–Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999)).  Indeed, an ALJ need not mention evidence that clearly would not impact his or her decision.  *See id.*; *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir.1990).  Rather, an ALJ need only articulate his or her reasoning well enough to allow a reviewing court to understand the basis for his or her decision. *See Bailey v. Comm'r of Soc. Sec.*, No. 98-3061, 1999 WL 96920, at *3–4 (6th Cir. 1999) (quoting *Hurst v. Sec'y of Health & Human Servs.*, 753 F .2d 517, 519 (6th Cir.1985)).

The ALJ began his decision by stating that he considered the entire record, and his discussion of Plaintiff's medical evidence gives the Court no reason to doubt this.  (ECF No. 9, PageID.43, 49.)  First, throughout his decision, the ALJ cited medical records that contained evidence of Plaintiff's size and neuropathy.  Indeed, while Plaintiff cited his function report and various medical records to establish that he had been diagnosed with neuropathy and prescribed treatment, the ALJ cited the same documents extensively throughout his written decision.  (*Compare* ECF No. 13, PageID.649–51, *with* ECF No. 9, PageID.45–54.)  Likewise, the ALJ cited many of the same documents Plaintiff refers to

that mention his weight and body mass index ("BMI").[3]  (*Compare* ECF No. 13, PageID.652, *with* ECF No. 9, PageID.45–54.)  Further, at his hearing, Plaintiff told the ALJ his height and weight and mentioned that he took Neurontin, a common treatment for neuropathy.  (ECF No. 9, PageID.70, 78); *see* Philip J. Wiffen et al., *Gabapentin for Chronic Neuropathic Pain in Adults*, Cochrane Database Sys. Rev., June 9, 2017.

The ALJ was almost certainly aware of the evidence of Plaintiff's neuropathy and obesity. [4]  However, separate from his obligation to consider the entire record, the ALJ must also articulate his rationale such that this Court can meaningfully review his findings. *Bailey*, 1999 WL 96920, at *3–4.  To that end, Plaintiff seems to argue that the ALJ erred because he did not "mention" either impairment in his discussion.  (ECF No. 13, PageID.651.)

I suggest that the ALJ would not have erred in finding that Plaintiff's obesity was a

---

[3] BMI is a measurement used by healthcare practitioners to diagnose obesity.  SSR 19-2p, 2019 WL 2374244, at *2 (May 20, 2019).  An adult's BMI is his or her "weight in kilograms divided by the square of his or her height in meters . . . ." *Id.*

[4] Arguably, the ALJ need not have considered either impairment at any step of the sequential evaluation. Plaintiff did not allege obesity or neuropathy as impairments in his application for benefits, and at his hearing, his attorney denied that Plaintiff had any impairments other than those listed in his application. (ECF No. 9, PageID.69, 106–07, 343, 351.)  On these facts alone, many courts would hold that the ALJ here need not have considered either impairment at any step in the sequential evaluation process, reasoning that a claimant waives any argument not made before the ALJ.  *See, e.g.*, *Mehay v. Comm'r of Soc. Sec.*, No. 19-cv-12991, 2021 WL 1175285, at *5 (E.D. Mich. Mar. 29, 2021) (citing *Motin v. Comm'r of Soc. Sec.*, No. 09-13354, 2010 WL 1754821, at *3 (E.D. Mich. Apr. 30, 2010)).  However, the Supreme Court recently held that social security claimants need not raise Appointments Clause challenges before an ALJ, reasoning that not only are agencies "ill suited to address structural constitutional challenges," but also that generally, issue exhaustion does not apply to non-adversarial administrative proceedings, such as those before the SSA.  *Carr v. Saul*, 141 S. Ct. 1352, 1358–61 (2021).  Although the Court limited its holding to Appointments Clause challenges, I see no reason why it would not extend to more "routine objections." *Id.* at 1360 n.5.  An ALJ must objectively consider a claimant's entire record and may *sua sponte* raise any issue it finds—a claimant should not have to direct the ALJ's attention to evidence that the ALJ must consider anyways.  42 U.S.C. § 423(d)(5)(B); *see* 20 C.F.R. §§ 404.946(b)(1), 404.1520(a)(3).  But in any event, the Court need not reach this issue because the ALJ considered the evidence of Plaintiff's obesity and neuropathy.

medically determinable impairment and he therefore had no reason to explicitly mention this impairment. But the ALJ did have evidence he could have relied on to find that Plaintiff's Neuropathy was a medically determinable impairment, and he should have articulated his rationale for implicitly finding that Plaintiff's neuropathy was not a medically determinable impairment.

A medically determinable impairment is one that "result[s] from anatomical, physiological, or psychological abnormalities" and "can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521 (2021). Accordingly, to be considered "medically determinable," an impairment "must be established by objective medical evidence from an acceptable medical source." *Id.* Objective evidence refers to medical "signs"[5] or "laboratory findings"—an ALJ may not use diagnoses, medical opinions, or a claimant's self-reported symptoms "to establish the existence of" a medically determinable impairment. *Id.* §§ 404.1521, 416.902(k).

For example, in *Brent v. Comm'r of Soc. Sec.*, this Court held that an ALJ relied on substantial evidence in finding that a claimant's back pain was not a medically determinable impairment where the only evidence of her condition were self-reported symptoms and a medical diagnosis. No. 17-12654, 2018 WL 5118598, at *8 (E.D. Mich. Aug. 21, 2018), *report and recommendation adopted by Brent v. Comm'r of Soc. Sec.*, No. 17-12654, 2018 WL 4403418 (2018). Specifically, the Plaintiff presented medical records

---

[5] A medical "sign" is an abnormality "that can be observed, *apart from [a claimant's] statements (symptoms)*." 20 C.F.R. § 416.902(l) (2021) (emphasis added). A claimant's "signs must be shown by medically acceptable diagnostic techniques." *Id.*

showing that she frequently reported to her physician with lower back pain.  *Id.*  Indeed, the claimant's physician often noted that her symptoms "were aggravated" by movement and could be alleviated by medication, heat, and rest.  *Id.*  And, for that reason, he diagnosed the claimant with "lumbago."  *Id.*  However, upon examination, the claimant exhibited a normal range of motion and her physician could not find any physical abnormalities.  *Id.*  Accordingly, the Court reasoned that because the record contained no "objective" medical evidence of her lower back pain, the ALJ correctly determined that the claimant's lower back pain was not a medically determinable impairment.  *Id.*; *see also* 20 C.F.R. §§ 404.1521, 416.902(l).

Similarly, here, Plaintiff provides no objective evidence that could establish his obesity as a medically determinable impairment.  Aside from a comment from his healthcare provider that he was "morbidly obese," the only evidence of his obesity Plaintiff cites are records of his BMI.  (ECF No. 13, PageID.652.)  However, only individuals with a BMI greater than thirty are generally considered obese, and Plaintiff consistently had a BMI that was slightly under thirty.  SSR 19-2p, 2019 WL 2374244, at *2; (ECF No. 9, PageID.436, 542, 580, 593, 608–09, 616, 621.)

Of course, Plaintiff's BMI does not preclude him, per se, from being obese.  Obesity is "characterized by an excessive amount of body fat" and although BMI correlates with obesity, it does not always accurately indicate obesity.  SSR 19-2p, 2019 WL 2374244, at *2–3.  Muscular individuals, for example, may have a BMI that is over thirty but not be obese, and individuals who carry relatively little muscle may have a below-thirty BMI yet still carry enough fat to be considered obese.  *Id.* at *3; Nitin Kapoor, *Thin Fat Obesity:*

*The Tropical Phenotype of Obesity*, Endotext, Mar. 14, 2021 (recognizing that individuals may have a "normal body weight (as measured by [BMI]) but a disproportionately high body fat percentage"). However, while Plaintiff's BMI does not preclude him from being obese, it also does not, by itself, indicate obesity. Plaintiff does not provide objective evidence, such as his body fat percentage, that could demonstrate obesity despite his low BMI. *See* SSR 19-2p, 2019 WL 2374244, at *3. Thus, the ALJ's failure to discuss Plaintiff's obesity does not prevent the Court from understanding his rationale—the ALJ could not have found Plaintiff's obesity to be a medically determinable impairment, and he did not err by failing to consider it when evaluating Plaintiff's RFC.

But the ALJ does not adequately explain his reasons for not finding Plaintiff's neuropathy to be a medically determinable impairment.[6] First, I note that much of the evidence Plaintiff relies on in support of his argument that his neuropathy was a medically determinable impairment is not relevant. For example, Plaintiff cites diagnoses from his healthcare providers, self-reported symptoms, and prescriptions. (ECF No. 9, PageID.649–51.) But none of these are medical signs or laboratory findings. *See* 20 C.F.R. §§ 404.1521; 416.902(l).

Even so, Plaintiff cites one piece of objective evidence that the ALJ does not mention in his decision. Specifically, Plaintiff states that his physician performed a monofilament test which revealed neuropathy in his feet. (ECF No. 13, PageID.651; ECF

---

[6] Although Plaintiff's diabetes may have caused his neuropathy, I suggest that his neuropathy is a distinct impairment, not a symptom of his diabetes. *Zanor v. Astrue*, No. 08-4584, 2009 WL 1133452, at *11 (D. Minn. Apr. 27, 2009).

No. 9, PageID.594.)  A monofilament test assesses a patient's ability to feel a nylon-thread pressed against his or her foot.  Jacquelien Dros et al., *Accuracy of Monofilament Testing to Diagnose Peripheral Neuropathy: A Systematic Review*, Ann. Fam. Med., Nov. 1, 2009. This is more than self-reported symptom—by performing the test, a physician can observe a patient's ability to respond to stimuli.  *Medley v. Saul*, No. 1:18-cv-211, 2019 WL 4169190, at *4 (E.D. Mo. Sept. 3, 2019) (recognizing that monofilament tests are objective evidence for purposes of finding a medically determinable impairment); *Manteau v. Colvin*, No. 12-1153, 2013 WL 1390018, at *6 (C.D. Cal. Apr. 4, 2013) (same).

While the record contains evidence that could establish Plaintiff's neuropathy as a medically determinable impairment, the ALJ neither mentions this impairment nor explains his rationale for failing to find that it was a medically determinable impairment. Consequently, the Court cannot evaluate his rationale to determine whether his finding was supported by substantial evidence.  *Bailey*, 1999 WL 96920, at *3–4.  Accordingly, I suggest that the ALJ erred by not discussing Plaintiff's neuropathy at step two.

For these reasons, I suggest that the ALJ considered all evidence of Plaintiff's obesity and neuropathy and implicitly found that neither impairment could be medically determinable.  Even so, while the ALJ need not have explained his rationale for not finding Plaintiff's obesity to be a medically determinable impairment, he should have articulated his rationale for not finding Plaintiff's neuropathy to be a medically determinable impairment.  Accordingly, the ALJ did not err at steps four and five by failing to consider Plaintiff's obesity, but the Court cannot evaluate whether the ALJ erred at these steps by failing to consider Plaintiff's neuropathy because it cannot determine whether his finding

was supported by substantial evidence.

### 2.   Diabetes

Plaintiff also argues that the ALJ failed to (1) consider his diabetes when determining his RFC and (2) discuss the impact of Plaintiff's diabetes on his RFC. These arguments belie the record. Indeed, when discussing Plaintiff's RFC, the ALJ explicitly recognized that Plaintiff alleged diabetes, and although the ALJ did not mention Plaintiff's diabetes again in his RFC discussion, his lengthy step two discussion indicates why. *See Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (reasoning that an ALJ could articulate the rationale for his step three findings in his step two discussion).

At step two the ALJ found that Plaintiff's diabetes did not cause "more than minimal limitations" on his ability to work. Indeed, while the ALJ acknowledged that Plaintiff's diabetes had primarily affected his eyes, he noted that Plaintiff managed his diabetes with medication and Plaintiff's physician did not believe that treatment was necessary to correct his diabetic retinopathy. (ECF No. 9, PageID.44, 628.) Further, Plaintiff described his cataracts as "tolerable" and testified that he drove a car "several times per week," and could cook, clean, wash clothes, and shovel snow. (*Id.* at PageID.44–45, 80–83, 628, 353.) Having already found that Plaintiff's diabetes caused minimal functional limitations, the ALJ need not have reiterated this analysis at steps four and five. *See Bledsoe*, 165 F. App'x at 411. The ALJ's step two discussion and his acknowledgement of Plaintiff's diabetes at steps four and five indicate that he considered Plaintiff's diabetes and sufficiently articulated his rationale for the Court to effectively review his finding. For these reasons, I suggest that the ALJ considered the effects of Plaintiff's diabetes on his RFC, and the

ALJ's RFC finding, insofar as it concerns Plaintiff's diabetes, is supported by substantial evidence.[7]

### 3.     Harmless Error

Although the ALJ erred, this alone does not compel remand.  While "agencies are bound to follow their own regulations," federal courts will not remand a matter to an agency unless "the claimant has been prejudiced on the merits or deprived of substantial rights . . . ."  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) (quotation marks omitted) (first quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004); and then quoting *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)).  In other words, the court will not remand if "the administrative agency would have made the same ultimate [conclusion] with the erroneous finding removed from the picture . . . ."  *Berryhill v. Shalala*, No. 92-5876, 1993 WL 361792, at *7, (6th Cir. Sept. 16, 1993) (quotation marks omitted) (quoting *Kurzon v. United States Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976)).

On appeal to the district court, the claimant bears the burden of proving not only that the ALJ erred, but that the ALJ's error was harmful.  Kubitsheck & Dubin, *supra*, § 9:57 (quoting *Shinseki v. Sanders*, 556 U.S. 396 (2009)).  Even so, many errors cause a harm that is "obvious" to the reviewing court.  *Kuotrakos v. Astrue*, 906 F. Supp.2d 30, 38 (D. Conn. 2012).  In these situations, the claimant need not explain precisely how he or she was prejudiced.  *Shinseki*, 556 U.S. at 410.  But when a harm is not obvious, the moving

---

[7] Again, Plaintiff does not argue that the ALJ's RFC was not supported by substantial evidence, only that he ignored evidence that "could" have justified a more restrictive RFC.  (ECF No. 13, PageID.652.)

party must "explain why the erroneous ruling caused harm."  *Id.*; *see McLeod v. Astrue*, 640 F.3d 881, 887 (9th Cir. 2011) (holding that *Shinseki* applies to social security cases).

Here, notwithstanding any possible error at step two, Plaintiff has not shown how he was harmed.  Instead, Plaintiff broadly asserts that "the symptoms, medications[,] side effects, [or] treatment pertaining to these impairments could reasonably reduce Plaintiff's RFC to the sedentary level or cause a work preclusive amount of time off task or absenteeism, amongst other things."  (ECF No. 13, PageID.651–52.)

But Plaintiff does not explain how the ALJ's error would cause these harms, and the undersigned struggles to imagine how he could.  A claimant's RFC describes "what the claimant can do, not what maladies [the] claimant suffers from . . . ."  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002).  Accordingly, "the mere existence of a severe impairment does not necessarily establish any functional limitations or disability."  *Matar v. Comm'r of Soc. Sec.*, No. 1:15-cv-291, 2016 WL 1064627, at *4 (S.D. Ohio Mar. 15, 2016), *report and recommendation adopted by Matar v. Comm'r of Soc. Sec.*, No. 1:15-cv-291, 2016 WL 1556147 (2016).  Even if the ALJ found more impairments, this does not necessarily mean that he could have found more limitations.  *Griffeth v. Comm'r of Soc. Sec.,* 217 F. App'x 425, 429 (6th Cir. 2007).

Thus, Plaintiff would only have been harmed by the ALJ's errors if, having acknowledged these impairments, the ALJ could have then relied on substantial evidence to find a more restrictive RFC.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546 (6th Cir. 2004).  Accordingly, to show that he was harmed, Plaintiff should have identified

29

specific functional limitations that could have been caused by these additional impairments. *See id.* at 547 (explaining that an error may be harmless where the claimant cannot identify substantial evidence to support a favorable outcome, even without the erroneous finding). In other words, Plaintiff must have at least shown that it would be "possible" for the ALJ to have found additional functional limitations based on these impairments. *See Koutrakos*, 906 F. Supp.2d at 38 (emphasis removed).

Yet while Plaintiff spends much of his brief discussing evidence of the existence of his impairments, he spends little time discussing how these impairments affected his functional abilities. In fact, the only time Plaintiff discusses a functional limitation is when he asserts that his neuropathy caused "balance issues due to numbness and tingling in his feet . . . ." (ECF No. 13, PageID.649.) But even accepting this as true, none of the available jobs identified by the vocational expert require balancing. *Dictionary of Occupational Titles* 222.687-014, 209.697-026, 369.687-018 (4th ed. 1991). Without providing some concrete nexus between the ALJ's failure to consider these impairments and the possibility that the ALJ might have found additional functional limitations, Plaintiff cannot demonstrate that the ALJ's error was harmful. *Cf. Abraham v. Comm'r of Soc. Sec.*, No. 18-12422, 2019 WL 5680809, at *8 (E.D. Mich. Aug. 17, 2019), *report and recommendation adopted by Abraham v. Comm'r of Soc. Sec.*, No. 18-12422, 2019 WL 5680320 (2019) ("[Claimant] fails to identify any additional limitations stemming from her carpal tunnel syndrome."); *Turvey v. Comm'r of Soc. Sec.*, No. 12-12388, 2013 WL 3271194, at *5 (E.D. Mich. June 27, 2013) ("Plaintiff does not specify any additional work-

related functional limitations the ALJ should have, but did not, include in the RFC assessment resulting from his pain or mental impairments.").

Nor was this harm so "obvious" that Plaintiff need not provide any explanation. Plaintiff's obesity, neuropathy, and diabetes appear relatively mild and based on the record the undersigned has found no obvious impact that these impairments might have had on Plaintiff's RFC.   While the undersigned understands how obesity, neuropathy, and diabetes, might impact a person's functional abilities in an abstract sense, whatever impact these impairments might have had, specifically on Plaintiff's RFC, is not self-evident, and the Court need not scour the record for substantial evidence in support of Plaintiff's argument. *Thomas v. Halter*, 131 F. Supp. 2d 942, 945 (E.D. Mich. 2001) (quotation marks omitted) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Accordingly, I suggest that any error regarding Plaintiff's neuropathy, obesity, or diabetes, would have been harmless, and the Court should affirm the ALJ's decision.[8]

## H.    Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **DENYING** Plaintiff's Motion, (ECF No. 13), **GRANTING** the Commissioner's Motion (ECF No. 15), and affirming the decision.

---

[8] I briefly note that the ALJ treated findings from a prior ALJ on the same matter as binding except where he found "new and material evidence." (ECF No. 9, PageID.41–42, 44–45, 50.)  However, in *Early v. Comm'r of Soc. Sec.*, the Sixth Circuit held that even where an ALJ does not find new and material evidence of a change in a claimant's condition, an ALJ may, but need not, accept a prior ALJ's findings when evaluating an unadjudicated period of time.  893 F.3d 929, 931–34 (6th Cir. 2018).  In other cases, the undersigned has not hesitated to raise this issue *sua sponte* and recommend that the Court remand. *E.g., Chad Everett Ridenour v. Comm'r of Soc. Sec.*, No. 20-cv-13272, 2022 WL 565583 (E.D. Mich. Feb. 24, 2022).  However, because Plaintiff has not demonstrated harmful error, I will not address this issue.

## III.  __REVIEW__

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  March 17, 2022                    S/ PATRICIA T. MORRIS
                                         Patricia T. Morris
                                         United States Magistrate Judge